IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAURICE B. STEWART, JR.,               *
             Plaintiff
           v.                      *    CIVIL ACTION NO. JFM-11-427

DR. JOUBERT, et al.,                 *
             Defendants
                         ***

MEMORANDUM

Medical defendants Correctional Medical Services Inc., Asresahegn Getachew, Ava Joubert-Curtis, Colin Ottey, and Jeanette Simmons and correctional defendants Richard J. Graham, Jr., Philip Morgan, Harry Murphy, and Michael P. Thomas, through counsel, have filed dispositive motions which are construed as motions for summary judgment.  ECF Nos. 20 & 28. Plaintiff has responded.  ECF Nos. 26, 34,  & 37.[1]  Upon review of papers filed, the court finds an oral hearing in this matter unnecessary.  *See* Local Rule 105.6 (D. Md. 2011).

**Background**

Plaintiff, an inmate currently confined at the Western Correctional Institution in Cumberland, Maryland alleges that he suffers extreme weakness, fatigue and pain in his lower extremities rendering him unable to walk.  He states that he is in constant pain and has muscle spasms in his lower back, legs and feet.  He states that from October, 2010 to February, 2011 he was denied constitutionally adequate medical care for his multiple ailments.  Plaintiff alleges that on October 14, 2010, he was placed in the prison infirmary because he could not ambulate.  Dr.

---

[1] In ECF No. 37 plaintiff for the first time claims that the weakness in his lower extremities is caused by Peripheral Arterial Disease. He has presented an article concerning PAD but has not indicated who diagnosed him as suffering from same. He also claims that he suffers from glaucoma.  To the extent these are new claims they are not properly before the court.  If plaintiff believes he has been denied adequate medical care for these issues he is free to file a new civil rights complaint naming the appropriate parties.

Joubert examined him, discharged him from the infirmary and directed he be sent back to his assigned cell even though he could not walk.  On another unspecified date, plaintiff states while in a holding cell he fell from his wheel chair onto the floor.  Dr. Joubert was called to assist but did not examine plaintiff.  Rather, she had correctional officers force him into a sitting position which caused him excruciating pain. He was then returned to his cell.[2] ECF No. 1.

Plaintiff states that on January 18, 2011, Dr. Getachew directed plaintiff be admitted into the WCI infirmary due to a fall in which he injured his back.  At an unspecified time plaintiff was seen by an oncologist who determined that plaintiff's sarcoma was not life-threatening and his difficulty ambulating was due to neurological damage.  While in the infirmary, plaintiff states he received Tylenol 3, Nubain, and physical therapy.  A few weeks later Dr. Ottey discharged plaintiff from the infirmary knowing that plaintiff still could not walk and could sit for only a limited time.   Ottey discontinued the Nubain and refused to reorder the Tylenol 3, leaving plaintiff in "debilitating pain."[3] *Id*. Plaintiff states that when he spoke with Dr. Getachew regarding his pain, Getachew refused to reorder the pain medication. *Id*.

Plaintiff states that Ottey told him he would be sent for an MRI but he never did. He indicates that Ottey and Joubert are aware of his fatigue and numbness in his groin.  He states that he was prescribed a catheter because he can no longer feel when he urinates or defecates but neither Ottey, Joubert, or Nurse Simmons ensured he received it.   He claims that Ottey and Joubert wrote a note to correctional staff that while in the infirmary plaintiff could only receive clean sheets once a week.  Because he had not received the catheter he soiled the linens, yet was forced to stay in the soiled sheets for the entire week. He states that correctional defendants as

---

[2] Plaintiff states he was then assaulted by his cellmate.  The issue of the assault is not before the court in this case. Plaintiff is litigating that claim in *Stewart v. Warden*, JFM-10-2926 (D. Md.).

[3] In his supplemental complaint plaintiff alleges it was Joubert who discontinued the pain medication.  ECF No. 6.

well as Getachew allowed him to remain in the soiled sheets.  ECF Nos. 1 & 6.  He states that he

has to crawl on the floor of his cell to use the toilet.  *Id.*

In his supplemental complaint, plaintiff alleges that on February 16, 2011, he was admitted

to the WCI infirmary for problems ambulating, severe pain in lower back and severe muscle

spasms.  While in the infirmary his mattress was placed on the floor for safety reasons.  Plaintiff

complained to Dr. Ottey that sleeping on the floor caused additional back pain due to a herniated

disk.  Ottey ordered plaintiff's mattress be put back in the bed but guardrails placed on the bed to

prevent plaintiff from falling.  Instead, Joubert ordered the mattress placed back on the floor.

ECF No. 6.   Plaintiff alleges that during his stay in the infirmary he contracted a staph infection.

*Id.*

Plaintiff alleges that Assistant Warden Richard Graham, Jr., posted a note on his cell door

instructing staff to deny plaintiff the use of any medical equipment which would assist him in

ambulating and to handcuff plaintiff behind his back against doctors' orders. Plaintiff states his

physical therapist instructed the Housing Unit Manager Lt. Harbaugh that plaintiff would need to

use a walker to get back and forth to physical therapy and other places.  Harbaugh and Getachew

approved the use of the walker.  Plaintiff further states that handcuffing behind his back causes

him excruciating pain due to his herniated disk. He states he has a medical order that he be

handcuffed in front. ECF Nos. 1 & 6.

Plaintiff seeks compensatory damages and injunctive relief that he be provided a wheel

chair and assigned to a medical cell.  ECF Nos. 1, 6 & 7.

According to defendants, plaintiff suffers a multitude of health problems including

asthma, epilepsy, hypertension, and chronic low back pain.  He underwent a resection of a

dermatofibrosacroma protuberans ("DFSP")[4] from his upper back in 2005. Medical defendants have provided relevant records concerning plaintiff's care. ECF No. 20, Ex. A, Ex. B, p. 3.

A.      Treatment for Low Back Pain

Plaintiff frequently complains of pain, tingling and numbness in his legs, decreased sensation in his groin and genitals, and low back pain, which he claims is attributable to metastatic cancer. ECF No. 20, Ex. A & B.    There is no evidence that plaintiff's DFSP has metastasized. *Id*.

On September 21, 2010, Dr. Joubert reviewed plaintiff's diagnostic studies from 2005 and 2007. The studies did not show that his DFSP was metastatic (spreading). Plaintiff underwent x-rays of his lumbosacral spine on October 14, 2010. The x-rays were negative for acute disease that could explain plaintiff's pain and neurological deficits. On January 11, 2011, Dr. Getachew requested an MRI study of plaintiff's back be approved. Wexford Health Services, Inc., ("Wexford"), the utilization review contractor for the State of Maryland, denied the request and suggested plaintiff be evaluated by an oncologist before he receive an MRI. Id., Ex. A, Ex. B., p. 12-18, 63-64.

On January 14, 2011, plaintiff reported that a chair collapsed under him and he fell to the floor. He was transported to the Washington Regional Medical Center ("WRMC") Emergency Department for evaluation. As part of his evaluation he underwent CT scans of his thoracic pine. The results were normal. *Id*. p. 66-71, 89.

On January 25, 2011, plaintiff was scheduled for an appointment with an oncologist; however, the appointment was canceled due to plaintiff reporting that he could not get out of

---

[4] DFSP is described as a relatively uncommon abnormal growth of tissue with intermediate to low grade malignancy. ECF No. 20. *See* http://www.sarcomahelp.org/learning_center/dfsp.html ("DFSP is a malignant tumor, but only metastasizes 1-4% of the time. Metastasis is a late clinical outcome and typically occurs only after several local recurrences.")

bed.  Plaintiff was evaluated on January 31, 2011, by Scott Watkins, M.D., a radiation therapy physician.  Watkins noted that plaintiff was a "somewhat difficult informant."  Watkins further noted that the 2005 MRI of plaintiff's thoracic and lumbar spines showed no evidence of malignancy and plaintiff had never received chemotherapy or radiation therapy for the original DFSP.  Watkins recorded plaintiff's numerous complaints.  Plaintiff reported: losing 60 pounds; suffering night sweats and chills; itching; chronic headaches; hearing difficulties; nosebleeds; sore throat; trouble swallowing; vision problems; inability to stand because of pain in his legs and numbness in his lower back; seizures; anxiety and depression; chest pain and irregular heart rate; chronic shortness of breath and cough; one episode of coughing up blood approximately one month earlier; nausea; vomiting; diarrhea; blood in stool and occasional black stools; incontinence of urine; and joint stiffness and pain.  *Id*. p. 55, 57, 107, 142-44,

Upon examination, Watkins noted that the sensation and strength in plaintiff's legs appeared reduced but in an inconsistent manner.  Watkins likewise noted that the neurological findings were variable.  Watkins determined there was no medical indication for plaintiff to undergo a CT or PET (positron emission tomography) scan.  Watkins further noted that he did not believe plaintiff had any clinical evidence of DFSP[5] and that while plaintiff was concerned about metastatic disease, DFSPs rarely metastasize.  Physical examination of plaintiff revealed plaintiff had keloids and hyper-pigmented subcutaneous nodules.  Watkins was unable to ascertain whether the keloids or nodules were recurrent DFSP or areas of scar tissue.  He recommended a biopsy and excision, if necessary.  He advised plaintiff that DFSP is a spectrum of skin changes with a likelihood of recurrence with the treatment of choice in the event of recurrence surgical resection followed by radiotherapy.  Watkins advised plaintiff that he felt the

---

[5] Plaintiff indicates that Dr. Garofalo, a radiation oncologist who treated him in 2005, diagnosed him as suffering from metastatic sarcoma.  ECF No. 26.  He concedes that Dr. Watkins "had a contrary medical opinion."  *Id*.

neurologic symptoms were of a different etiology unrelated to the DFSP. *Id*.

On February 15, 2011, Dr. Joubert requested a surgical consultation for plaintiff. Greg Flury, PAC, noted, on March 18, 2011, that plaintiff was scheduled for an excision and biopsy of the back lesion but refused to attend until he "talked to his lawyer."[6] *Id.*, p. 187-88, 221, 226-27.

Plaintiff also received physical therapy ("PT") in an effort to address his low back pain. On September 6, 2010, Dr. Ottey ordered plaintiff receive PT. Plaintiff received PT from September 9 to October 5, 2010.[7] On October 5, 2010, plaintiff advised the therapist that PT was not improving his condition and he believed his condition might have worsened because of the PT. Plaintiff was discharged from therapy and advised to do the PT exercises in his cell. *Id*., 5, 245-50.

On December 14, 2010, Lisa Schindler, PAC ordered additional PT for plaintiff. Plaintiff frequently refused to attend, resulting in the PT sessions being discontinued on February 9, 2011. On February 16, 2011, P.A. Schindler again ordered PT for plaintiff; however on February 25, 2011 he again refused to attend his session and refused all subsequent sessions thereafter.[8] *Id.*, p. 56, 58, 62, 83, 94, 96-97, 123, 138, 145, 171, 175, 193, 251-274.

From September 2010 to March 2011, plaintiff received a variety of pain medications and muscle relaxants in order to alleviate his reported low back pain. Plaintiff frequently complained that a specific medication did not relieve his pain and his medication was switched. From

---

[6] Plaintiff admits that he refused to be transported. He claims he refused to be transported because of the MRSA infection and his fear of "transmitting" the infection to other inmates during transport. He denies inciting the other inmates but admits that he informed the other inmates "of my contagious disease and the hazards of close contact." ECF No. 26.

[7] Plaintiff also advises Dr. Ottey prescribed a compression stocking for his complaint of leg pain/swelling. ECF No. 26.

[8] Plaintiff disputes that he refused PT. He states that either he was ill or correctional staff would not provide him with a walker so that he could ambulate to the PT appointment. ECF No. 26. PT notes provided by plaintiff indicate, however, that he was non-compliant during therapy sessions. Id., Ex. 5 ("continue with poc patient should try to do some exercises next visit to gain strength. Patient has NOT attempted to stand and refused both times that he was asked.") (Emphasis in original).

September 2010 to March 2011, plaintiff received Neurontin, an anti-epileptic medication used to treat chronic pain, and Baclofen, a muscle relaxant.  He also received short courses of Tylenol #3 as well as other narcotic pain relievers including Ultram and Nubain.  He was also prescribed a non-steroidal anti-inflammatory medication-Naprosyn, and Flexeril and Robaxin-muscle relaxants.  *Id.,* 3, 7-9, 13, 16-17, 19-20, 27, 29, 31-33, 35, 40-47, 49-50, 54, 62, 76-78, 80, 82-86, 88-89, 91, 93-95, 103-104, 106-08, 110, 112-15, 117, 119-21, 123, 125-26, 128, 130-31, 133, 135, 137-38, 145-48, 150, 153, 155-56, 158, 160-162, 165-66, 168, 170, 172, 175, 177, 180, 185-91, 195, 197, 199, 201, 203, 205, 207-211, 214-15, 217, 219, 222, 224, 227-28, 231-32, 235, 239.

B.      Treatment for Leg Weakness//Difficulty Ambulating.

On October 5, 2010, plaintiff refused to attend an appointment scheduled at the University of Maryland Medical System ("UMMS") because, according to him, he slipped out of his wheelchair while leaning over to urinate and was in pain.  Dr. Joubert evaluated plaintiff. She observed plaintiff was fully alert and lying on his right side on the floor.  Plaintiff complained that his left flank and lower back were too painful for him to move and he was in too much pain to attend his appointment at UMMS.  Dr. Joubert observed that plaintiff moved both his legs and arms to straighten his position on the floor and that he showed no signs or symptoms of any injury. Plaintiff refused to cooperate when Dr. Joubert tried to assist him off the floor and refused to try to get up by himself.  He became angry when Dr. Joubert informed him there was no reason for him not to attend the appointment at UMMS.  At the conclusion of the evaluation plaintiff was escorted back to his cell by correctional staff. 9 *Id.*, 19-20.

---

[9] Plaintiff indicates that forcing him back into the wheelchair caused him pain.  ECF No. 26. Plaintiff has provided a medical note which indicates that he should be allowed to use a wheelchair when he is unable to walk.  The note signed July 31, 2010 by Dr. Ottey indicates that it is to be in place for a year.  *Id.*, Ex. 4. The note does not prescribe plaintiff a wheelchair or direct he be permitted to use one in his cell.  *Id*.

Plaintiff was evaluated by Majd Arnaout, M.D. (Dr. Arnaout") on October 18, 2010.  Dr. Arnaout noted that the medical chart indicated that in May, 2008, plaintiff received a neurological examination by an off-site neurologist due to his complaint of leg weakness and difficulty ambulating.  Arnaout noted that the neurologist reported plaintiff's symptoms did not fit with any anatomical neurological pathology and his complaint of paralysis and need for a wheelchair was "very bizzare [sic] since he was seen by many nurses moving himself from wheelchair to the ambulance without any assistance." *Id*., 9-11, 14, 32, 34-35, 37.

Plaintiff has been admitted to the Western Correctional Institution Infirmary for observation and treatment of his complaint of leg weakness and difficulty ambulating on several occasions.  While housed at both NBCI and in the infirmary staff have observed plaintiff move his legs without difficult and respond appropriately to neurological tests for reflexes and sensation.  Plaintiff exhibits no muscle wasting, tendon shortening or spastic extensor reflexes which are commonly seen in patients with paraplegia.  Plaintiff is able, without assistance, to reposition himself in bed; turn himself from his back to his stomach and from side to side; sit up in bed; sit on the end of his bed to change the channels on the television; get on and off a bedpan; cross and uncross his legs; remove and replace the sheets on his bed; ambulate with assistance; bend his knees; and feel pain from an intramuscular injection. *Id*., 21-33, 43-45, 72-76, 78-79, 81-82, 92-93, 98, 101-03, 106, 109, 114, 116-17, 124, 128-29, 132-34, 149, 152, 154-55, 157-58, 160, 164, 167, 169, 171, 1758, 185, 194-98, 200-03, 206,

On January 29, 2011, Donald Manger, M.D., noted that the etiology of plaintiff's difficulty with ambulation was unknown.  He also noted plaintiff refused to be transported for an MRI study. *Id*., p. 131.

On January 31, 2011, a nurse found plaintiff on the floor of his infirmary room.  Plaintiff

reported he fell while trying to walk to the bathroom. No signs or symptoms of injury were observed and plaintiff was able to use his legs while being assisted to his bed. *Id*., p. 136-37.

On February 14, 2011, while housed at NBCI, plaintiff was found on the floor of his cell. He reported to the nurse that he fell out of a chair from a sitting position. Dr. Ottey suggested plaintiff place his mattress on the floor for his safety. Plaintiff refused. He remained on the floor by his own request. Plaintiff was admitted the infirmary the following day for observation where he stayed until his discharge on February 19, 2011. *Id*., p. 177-78, 180-84, 191, 206.

On February 28, 2011, plaintiff ambulated from his housing unit to the medical unit with assistance of correctional staff. On March 4, 2011, he ambulated to the medical unit with the use of a walker for an appointment with Dr. Getachew. During his appointment, plaintiff reported he was regaining power in his leg muscles, but he requested Flexeril to help with muscle spasms. Flexeril was prescribed. Dr. Getachew noted that at the next visit he would discontinue plaintiff's walker and provide plaintiff a walking cane. However, on April 14, 2011, Dr. Ottey approved a walker for plaintiff to use for six months. *Id*., p. 219, 223, 233.

3.    Treatment for Urinary Incontinence

Plaintiff submitted a sick call request on September 26, 2010, indicating he could not feel himself urinate. Plaintiff was provided a Texas (condom) catheter to perform self-catheterization as needed for incontinence/urine retention.[10] Plaintiff was observed in the infirmary in October of 2010, removing the Texas catheter and using a urinal. Likewise, while plaintiff was in the infirmary in January and February, 2011, the medical staff frequently observed plaintiff using the

---

[10] It appears that there was a delay of several weeks in providing the prescribed catheter to plaintiff. ECF No. 26, Ex. 8. Plaintiff maintains that he did not receive the catheter for months and once it was provided to him it was removed from him approximately one week later. In his effort to demonstrate a serious medical need, he paradoxically alleges that he required the catheter because he could not feel the need to urinate and that he suffered discomfort overnight from holding his urine. *Id*. He admits he disconnected the catheter to allow him freedom of movement while bedridden. *Id*.

urinal rather than the catheter.  Plaintiff was also observed disconnecting the Texas catheter and reconnecting it when he needed to urinate.  On February 21, 2011, Dr. Joubert discontinued the order for a Texas catheter, ordering instead plaintiff use a urinal, finding there was no medical indication for a Texas catheter given plaintiff could remove and reattach the catheter when he needed to empty his bladder.  Since that time plaintiff offered no further complaints of incontinence.  *Id.*, p. 14-17, 26, 32, 36, 39-40, 42-46, 65, 74, 81, 85, 87, 111, 122, 127, 132, 149, 151, 167, 185, 189-90, 192, 194, 196, 201-02, 205, 208.

4.     Treatment for Methicillin-Resistant Staphylococcus Aureus ("MRSA") Infection

Plaintiff was examined on February 27, 2011, by Steven Bray, R.N. due to plaintiff's complaints of a swollen and infected face and neck.[11]  Bray noted a boil on plaintiff's left check and the right side of plaintiff's neck.  Bay also noted multiple large whiteheads on both of plaintiff's cheeks.  The boils were red, warm, swollen and not draining.  Plaintiff was prescribed a 15-day supply of Bactrim to treat the boils which were resolved by March 18, 2011.  *Id.*, p. 216-19, 222-27.

On May 10, 2011, Bray again evaluated plaintiff due to plaintiff's complaint of a boil on his chin.  Bray noted the boil was draining green purulent fluid.  Plaintiff was provided a 15-day supply of Bactrim to treat the boil.  A culture of the drainage grew MRSA which was sensitive to Bactrim.  The infection and boil were resolved by May 21, 2011.[12] *Id.*, p. 238-44.

---

[11] Plaintiff seems to suggest that he contracted MRSA due to the unsanitary conditions of the prison infirmary. ECF No. 26.  Plaintiff complains that he was only entitled to one set of sheets per week while housed in the infirmary. He states that despite his soiling the sheets due to his incontinence he was denied clean sheets.  Medical records indicate the sheets were not soiled and plaintiff was advised he would be entitled to clean sheets on a weekly basis, unless the sheets were soiled.  ECF No. 26, Ex. 10.

[12] Plaintiff maintains that the infection was not cured with the first round of antibiotics. He also states that the second infection was treated with Bactrim and Doxycycline.  He maintains that had the infection been cultured the first time he would not have suffered so long. ECF No. 26.

5.      Correctional Defendants

Assistant Warden Richard Graham avers that he did not post and did not direct anything

be posted on plaintiff's cell.  He further avers he did not deny plaintiff any medical services or

equipment.  ECF No.  28.

## Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that
> there is no genuine dispute as to any material fact and the movant
> is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat

the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged
> factual dispute between the parties will not defeat an otherwise properly
> supported motion for summary judgment; the requirement is that there be no
> *genuine* issue of *material* fact.

 *Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the

mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing

that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346

F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court

should "view the evidence in the light most favorable to....the nonmovant, and draw all

inferences in her favor without weighing the evidence or assessing the witness' credibility."

*Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644-45 (4th Cir. 2002).  The court

must, however, also abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal

quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4ᵗʰ Cir. 1993), and

citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Analysis**

A.      Supervisory Liability

Section 1983 liability on the part of a supervisor requires a showing that:  (1) the

supervisory defendant failed promptly to provide an inmate with needed medical care; (2) the

supervisory defendant deliberately interfered with the prison doctors' performance; or (3) the

supervisory defendant tacitly authorized or was indifferent to the prison physicians'

constitutional violations. *See Miltier v. Beorn*, 896 F. 2d 848, 854 (4ᵗʰ Cir. 1990); *see also Slakan

v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984).    In his complaint, plaintiff makes no specific

allegations against correctional defendants Warden J.  Philip Morgan, Assistant Warden Harry

Murphy, Chief of Security Michael P. Thomas.   Rather, it appears that plaintiff seeks to hold

these correctional defendants responsible for his alleged lack of medical care due solely to their

supervisory roles as administrators of the facility.   This is the very essence of the doctrine of

respondeat superior, which has no place in § 1983 litigation.   Defendants Morgan, Murphy and

Thomas are entitled to summary judgment in their favor.

Likewise, plaintiff's allegation against Correctional Medical Services, Inc. (CMS), the

private prison health care provider, is based solely upon the doctrine of  respondeat superior.

The law in the Fourth Circuit is well established that the doctrine of respondeat superior does not

apply in § 1983 claims, even where the defendant is a private corporation, rather than a

municipality or other public agency. *See Nedd v. Correctional Medical Services*, Civil Action

No. JFM-92-1524 (D.Md., October 22, 1992), citing *Powell v. Shopco Laurel Co., 678 F.2d 504,

506 (4th Cir. 1982); McIlwain v. Prince William Hospital*, 774 F.Supp. 986, 990 (E.D.Va. 1991).

Plaintiff's claim against Correctional Medical Services shall be dismissed.

**B.      Medical Claim**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue

of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173

(1976).     To state an Eighth Amendment claim for denial of medical care, plaintiff must

demonstrate that the actions of defendants (or their failure to act) amounted to deliberate

indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Deliberate indifference to a serious medical need requires proof that, objectively, plaintiff was

suffering from a serious medical need and that, subjectively, the prison staff were aware of the

need for medical attention but failed to either provide it or ensure the needed care was available.

*See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, the medical condition at issue must be serious.  *See  Hudson v.*

*McMillian,* 503 U.S. 1, 9 (1992) (no expectation that prisoners will be provided with unqualified

access to health care).   Proof of an objectively serious medical condition, however, does not end

the inquiry.  The second component of proof requires "subjective recklessness" in the face of the

serious medical condition.  *Farmer*, 511 U.S. at 839– 40.  "True subjective recklessness requires

knowledge both of the general risk, and also that the conduct is inappropriate in light of that

risk."  *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997).   "Actual knowledge or awareness

on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference

'because prison officials who lacked knowledge of a risk cannot be said to have inflicted

punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995),

quoting *Farmer,* 511 U.S. at 844.   If the requisite subjective knowledge is established, an

official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not

ultimately averted." *Farmer*, 511 U.S. at 844.   Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris* 240 F. 3d 383 (4th Cir. 2001), citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).  Further, "[d]isagreements between an inmate and a physician over the inmate's proper care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

Plaintiff's allegations that he did not receive adequate treatment for his multiple ailments is belied by the uncontroverted medical records.  Plaintiff has been provided a variety of pain medications and muscle relaxants to treat his low back pain and muscle weakness.  He has also been provided PT and referred to off-site specialists for consultation for his low back pain and neurologic issues.  That there is no ready diagnosis as to the source of plaintiff's pain and weakness does not amount to a denial of care.   Further, he has been prescribed antibiotics which successfully treated his two MRSA infections.  He was provided a Texas catheter due to his complaint of urinary incontinence and the order was rescinded after it was observed plaintiff did not require and was in fact not using the catheter.  Plaintiff's disagreement with a course of treatment does not provide the framework for a federal civil rights complaint. *See Russell v. Sheffer*, 528 F. 2d 318 (4th Cir. 1975).

Additionally, plaintiff's claim that Assistant Warden Graham violate medical orders by denying him use of medical equipment and directing he be handcuffed in the back is unavailing. There is no evidence before the court that plaintiff had orders to use medical equipment such as a walker or cane in his cell.  Nor is there evidence that plaintiff had a medical order to be handcuffed in front only.  Absent such orders, plaintiff cannot support a claim that Graham was

deliberately indifferent to serious medical needs.  Moreover, as noted supra Graham avers that he did not interfere with plaintiff's medical treatment.  ECF No.28.

In granting summary judgment to defendants the court does not imply that the plaintiff is not entitled to medical treatment for his serious condition.   The right to treatment, however,  is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir.1977) (emphasis added).   The undisputed evidence is that plaintiff's requests have been considered and his needs addressed.  There is no evidence that any delays that have occurred have been deliberate; to the contrary, much of the delay has been caused by plaintiff who on a number of occasions refused the offered treatment/evaluation. To the extent some of plaintiff's many complaints have gone unaddressed, "an inadvertent failure to provide adequate medical care does not amount to deliberate indifference." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).  Plaintiff's numerous grievances with the medical decisions made about the tests and treatments necessary in light of his symptoms are reflective of his frustration, but   "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged."  *Wright v. Collins*, 766 F.2d 841, 849(4th Cir.1985), citing *Gittlemacker v. Prasse,* 428 F.2d 1, 6 (3rd Cir. 1970).  There are no exceptional circumstances in this case.

C.      Americans with Disabilities Act

In order to state a claim under the ADA, a plaintiff must show that he is a person with a disability as defined by the statute; that he is otherwise qualified for the benefit he claims to have been denied; and that he was excluded from the benefit due to discrimination based on disability. *See Doe v. University of Md. Medical Systems Corporation*, 50 F.3d 1261, 1265 (4th Cir. 1995);

*see also* 42 U.S.C. Section 12131 *et seq.*

To the extent plaintiff claims that a denial of medical treatment violates his rights under the ADA or RA, his claim fails. Although the Fourth Circuit has not addressed this issue in a published opinion, unpublished cases from this circuit and cases from other circuits indicate that a prisoner may not state a claim under the ADA or RA for a lack of medical treatment.[13] Plaintiff has failed to establish that he is disabled within the meaning of the ADA or RA, nor is there any evidence to suggest that plaintiff suffered discrimination because of a disability. Accordingly, his ADA and RA claims fail.

Conclusion

For the reasons stated above, defendants' motions to dismiss or for summary judgment shall be granted.  A separate order follows.


_____January 31, 2012_____          _____/s/_____
Date                                      J. Frederick Motz
                                          United States District Judge

---

[13] *See, e.g. Miller v. Hinton,* 288 Fed. Appx. 901 (4th Cir. 2008) (prison's alleged denial of access to colostomy bags and catheters by inmate, who was a paraplegic confined to a wheelchair who used such supplies for urinary bladder control, did not constitute disability discrimination in violation of ADA absent a showing that inmate was treated in that manner because of his disability); *Burger v. Bloomberg,* 418 F.3d 882, 883 (8th Cir. 2005) (medical care provided to inmate for his diabetes could not be basis for RA action); *Fitzgerald v. Corr. Corp. of Am.,* 403 F.3d 1134, 1144 (10th Cir. 2005) (inmate's claims under RA and ADA were properly dismissed for failure to state claim as they were based on medical treatment decisions); *Spencer v. Easter,* 109 Fed. Appx. 571, 573 (4th Cir. 2004) (failure to provide timely refills of prescription drugs did not amount to an ADA violation where there was no showing that it was done based on prisoner's disability); *Bryant v. Madigan,* 84 F.3d 246, 249 (7th Cir.1996) (holding that the ADA is not "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. No discrimination is alleged; Bryant was not treated worse because he was disabled.").